Filed 12/10/13  Sylla v. Long CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| JOHN R. SYLLA,<br><br>          Plaintiff and Appellant,<br><br>v.<br><br>P. JAN LONG et al.<br><br>          Defendants and Appellants. | A135285<br><br>(San Mateo County<br>Super. Ct. No. CIV449726)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING [NO CHANGE IN JUDGMENT]** |

THE COURT:

It is ordered that the opinion filed herein on November 18, 2013 be modified in the following particular:

On page 3, last full sentence *before* subdivision B, stating "Sylla was an investor from the beginning and in March 2003, Sylla became KatanaMe's chief operating officer and chief financial officer, as well as a shareholder" be modified to omit "and chief financial officer," so that the new sentence reads:  "Sylla was an investor from the beginning and in March 2003, Sylla became KatanaMe's chief operating officer, as well as a shareholder."

There is no change in the judgment.

Appellants' petition for  rehearing is denied.

Dated:_____

_____P.J.

1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| JOHN R. SYLLA,<br><br>　　　　Plaintiff and Appellant,<br><br>v.<br><br>P. JAN LONG et al.<br><br>　　　　Defendants and Appellants. | A135285<br><br>(San Mateo County<br>Super. Ct. No. CIV449726) |

## INTRODUCTION

Defendants P. Jan Long and Victor K.L. Huang appeal from a judgment of the San Mateo County Superior Court in favor of KatanaMe Inc., a Delaware corporation (KatanaMe), as represented derivatively by plaintiff John Sylla, after a court trial on Sylla's shareholder's derivative claims in connection with the sale of the assets and intellectual property of KatanaMe to Skipper Wireless, Inc., a Japanese corporation (Skipper Wireless).  The crux of the derivative claim against defendants was that in February 2005, defendants secretly planned to divert KatanaMe's assets into a newly formed corporation, Skipper Wireless, for the purpose of benefitting themselves at the expense of Sylla and other KatanaMe shareholders.  The sale closed and the assets of KatanaMe were transferred to Skipper Wireless on April 15, 2005, with KatanaMe shareholders receiving nothing, but director defendants Long and Huang receiving lucrative compensation plus indemnity from the buyer for alleged breaches of their fiduciary duties.

1

The court found defendants breached their fiduciary duties to shareholders of KatanaMe and entered judgment against defendants Long and Huang, jointly and severally, in the amount of $2.2 million on the derivative claims prosecuted by Sylla on behalf of KatanaMe.

Defendants contend the trial court misapplied Delaware laws regarding the fiduciary duties of disclosure, good faith and loyalty, and erred in refusing to apply the business judgment rule to defendants' actions. Specifically, defendants argue: (1) the court erroneously equated a breach of the duty of disclosure with breaches of the fiduciary duties of loyalty and good faith; (2) plaintiff failed to prove any false statements or omissions of material fact; (3) the court's factual findings did not support its finding a breach of the duty of loyalty; (4) approval of the asset sale by a majority of KatanaMe's disinterested shareholders precluded a claim for breach of the duty of loyalty; (5) the court applied an incorrect legal standard in finding a breach of the duty of good faith; and (6) the court's finding that defendants breached their duty of good faith is unsupported by substantial evidence. Defendants further contend: (7) the court's findings regarding defendants' destruction of evidence are not supported in the record and are insufficient as a matter of law; (8) the business judgment rule applies and, even if it did not, defendants proved the transaction was "entirely fair." (9) Finally, defendants contend the damage award was not supported by substantial evidence where the court arbitrarily rejected the testimony of defendants' expert and awarded speculative damages.

Plaintiff Sylla appeals from the court's refusal to award prejudgment interest.

We shall affirm the judgment in its entirety.

## FACTS AND PROCEDURAL BACKGROUND

### A.     *Founding of KatanaMe*

KatanaMe is a Delaware corporation, founded in February 2002 by Long, Huang, Ian L. Sayers and Michio Fujimura.[1] KatanaMe was founded to develop consumer broadband wireless technology. The corporation was initially funded through the

---

[1] Neither Sayers nor Fujimura were defendants at the time of trial.

purchase of common stock by friends and family of the founders. In 2002, KatanaMe raised over $1 million from two "seed rounds" of financing. In March 2003, Nintendo invested $4.5 million in the corporation, receiving 1,666,666 series A preferred shares for its investment. The Thomas Stewart Family Trust also invested in March 2003 and Inventech Technology, Ltd. (Inventech) invested in KatanaMe in November 2003. Both received series A preferred stock. Nintendo was given "board observer rights" in connection with its investment and Sumitaka (Sam) Matsumoto was named its observer. Sylla was an investor from the beginning and in March 2003, Sylla became KatanaMe's chief operating officer and chief financial officer, as well as a shareholder.

## B. *Financial Difficulties and the Search for Investors*

By late summer of 2003, KatanaMe was facing financial difficulties and the board of directors approved the indefinite deferral of salaries for its officers, Long, Huang, Sayers and Sylla, effective September 1, 2003. Sharp Corporation was considering investing in KatanaMe, provided that the officers would personally guarantee the investment in the event certain development milestones were not reached. Sylla objected to the personal guarantees. The relationship between Sylla and Long soured and Sylla resigned from KatanaMe on September 23, 2003.

In late 2003, KatanaMe sought additional funding from Innotech Corp., IXT Corp. and Inventech. The efforts were unsuccessful. Nintendo also declined to make an additional investment in the corporation. However, Long was able to negotiate a series of payments from Nintendo starting with an immediate payment of $189,300 and three subsequent payments of $209,417, if certain milestones were met.

On January 15, 2004, Sylla filed a breach of employment contract action against KatanaMe. (*Sylla v. KatanaMe,* Super. Ct. San Mateo County (2004) Civ. No. 436822.) He voluntarily dismissed that action based upon a tolling agreement proposed by KatanaMe.

## C. *ATA proposals*

In March and April 2004, discussions occurred between KatanaMe representatives and ATA Ventures (ATA) regarding the latter's investing in KatanaMe. ATA was

formed in 2003, and first funded in 2004. It was structured as a partnership with three managing directors or partners: Hatch Graham, Fujimara (a KatanaMe director and shareholder at the time) and Peter Thomas (a KatanaMe preferred shareholder through the Thomas-Stewart Family Trust). On April 20, 2004, ATA submitted a nonbinding "term sheet" proposing a $12 million investment in the corporation by ATA and two other as yet unidentified venture capital investors, who together would receive series B stock amounting to a 42 percent ownership interest in KatanaMe. Under the term sheet, ATA would invest $5 million and two other investors would provide an additional $7 million, provided Long resigned as CEO, although he would continue with a lower title to receive the same salary and benefits. After discussing the matter with both ATA and Nintendo, which had to approve the deal, the board of directors (at that time consisting of Long, Sayers, and Fujimura) unanimously approved the term sheet.

On April 26, 2004, at the urging of Fujimura, KatanaMe engineers met secretly with Graham, who was leading ATA's due diligence effort, to discuss the actual status of KatanaMe's technology. KatanaMe's engineers expressed concerns that Long and Huang were misrepresenting the state of KatanaMe's technology. Nevertheless, the engineers believed KatanaMe had "valuable technology" that could be fixed by changing radio frequencies. Huang testified the technology was commercially viable, met specifications, and that the corporation needed the time and resources to complete development. He believed that KatanaMe would have made a viable product if it had adequate funding.

Between May 20 and 24, 2004, ATA withdrew its $12 million term sheet. On May 26, 2004, ATA presented a term sheet that reduced its proposed investment to $3.5 million, with no other investors, in exchange for the purchase of series B preferred stock, giving ATA control of 51 percent of KatanaMe. Under the $3.5 million term sheet, the founders' ownership percentage would be reduced from 42.8 percent to 14.68 percent. This term sheet explicitly required Long to step down as a director and officer, with a severance package of no more than six months salary and benefits. Graham would become a director and the interim CEO. On May 28, 2004, Nintendo

4

executed and returned a written approval for the $3.5 million term sheet. On May 31, the KatanaMe board, consisting of Long, Sayers, and Fujimura, unanimously rejected ATA's $3.5 million proposal. Huang was also present. In an email to Long, Huang characterized the $3.5 million as an "idiotic valuation." Long testified the board rejected the offer because they did not trust Graham and that the proposal was not a serious valuation of KatanaMe. Fujimura testified he, the other board members, and Huang all believed the price was "too low" and KatanaMe had a higher value.

Neither the defendants nor KatanaMe formally told ATA that the $3.5 million proposal was rejected or the reasons why. An email from Graham to Long indicated Fujimura had "passed along" to Graham that the term sheet had been rejected. However, further inquiry by Graham on behalf of ATA asking why the proposal had been rejected and inviting further discussion of the proposal was ignored. Despite ATA's repeated efforts to resume negotiations with KatanaMe, and ATA's continued interest in investing in KatanaMe, defendants refused to communicate with Graham. On June 2, 2004, Graham wrote Long and Sayers expressing ATA's continued interest in investing in KatanaMe and in negotiating an acceptable price and terms. Long refused to speak with Graham. When Long approached ATA partner Thomas, Thomas instructed him to discuss his concerns with Graham. Graham sent another email seeking to meet to discuss any issues with the $3.5 million term sheet. Graham never received any further contact from Long.

**D.** *Continued Difficulties, Board Changes, Further Search For Investment, KatanaMe Ceases Operations*

On June 6, 2004, Fujimura resigned from the KatanaMe board of directors and was replaced by Huang. In July 2004, Nintendo informed KatanaMe that it was not interested in proceeding further with development of the company's technology prototype, known as "KitKat." Consequently, KatanaMe shut down its operations and terminated all of its paid employees. Sayers resigned from the board in late July and moved to England, leaving Long and Huang as the only board members. In July and August 2004, KatanaMe offered to sell Nintendo half ownership in KatanaMe patents for

$4.5 million and to use the money to finish a prototype as well as continue to prosecute patents it had filed, on condition that if KatanaMe failed to develop the prototype, Nintendo would become full owner of KatanaMe's technology. In August 2004, Long, Huang and Sayers offered all of their founders' common stock to Nintendo for Nintendo to take over control and development of the prototype product. After conducting due diligence review, Nintendo informed Long in early October 2004, that it was rejecting the opportunity. Long and Huang continued to seek investment from numerous other sources, including Microsoft, Netcore Solutions, Venture Tech Alliance, IGlobe Partners, Walden International, TIF Ventures, Sycamore Ventures, Fujitsu and Intel. No one was interested.

KatanaMe was being pressured by creditors during this time. It had received a demand letter from AvNet Inc. in August 2004, and was sued by creditor Agilent Financial Services for approximately $185,000 in September. Granite Insurance contacted KatanaMe in November 2004, seeking payment of approximately $45,000. To have its attorneys (Orrick, Harrington and Sutcliffe, LLP, hereafter Orrick) continue to represent it, in November 2004, KatanaMe executed a secured promissory note agreement with Orrick in the amount of $279,980 relating to unpaid fees to Orrick dating back to February 2004. In early 2005, KatanaMe also needed to engage its outside patent counsel to prosecute several of its pending patent applications, to prevent them from being rejected.

E.     *Sale of Assets to Skipper Wireless for $800,000*

Long approached IT-Farm, a Japanese company. It was proposed that IT-Farm buy KatanaMe's intellectual property and form a new company, eventually named Skipper Wireless, that would develop KatanaMe's intellectual property. Long requested that IT-Farm loan KatanaMe $32,000 in advance of the new company's formation for the purpose of providing "good faith" payments to Avnet and Agilent to keep them from further prosecuting their claims and to provide its patent attorneys sufficient funds to complete KatanaMe's patent applications.

6

Long and Huang left it to Sam Matsumoto, a representative of Nintendo, and a founding member of Skipper Wireless, to communicate with IT-Farm regarding the deal because Long did not speak or read Japanese. Matsumoto was never a director, officer, or shareholder of KatanaMe. On February 4, 2005, Long emailed IT-Farm regarding structuring its payment of the deferred compensation to him, Huang and Sayers, as part of the KatanaMe technology sale, stating in relevant part: "Also, I have previously discussed with Sam it is preferable not to include our (Ian, Vic, Jan) executive accrued salaries as part of this 'IPR sale.' There would be many additional tax liabilities as well as other complications in paying off executive salary as part of the IPR sale. It is best to simply eliminate KatanaMe's creditor debt completely, not including the back salary for Vic, Ian, and myself. If possible, we would like to ask instead to arrange for this backsalary [*sic*] to be something treated as a split between a 'signing bonus' for Ian, Vic, and myself, as well as stock for us in the new company. We want to be clear that we will accept any suggestion/solution you and Sam may have on this, and are not making any demands whatsoever."

As Long outlined on February 9, 2005, in a detailed "tasks" list to Matsumoto and Mori Tesuya of Mitsubishi/Diamond Capital, regarding formation of the new company, the plan was to: (i) secure the advance of $32,000 by February 11; (ii) form Skipper Wireless on February 18; (iii) confirm creditor list/liabilities on February 11; (iv) confirm Mitsubishi/Diamond Capital commitment to the new company on February 28; (v) settle all creditors on February 28; (vi) infuse new capital into Skipper Wireless on February 28; (vii) execute the intellectual property purchase agreement on February 28; and (viii) file Chapter 7 bankruptcy for KatanaMe. According to Long, IT-Farm would only agree to pay off outside creditors (not including back pay owed to KatanaMe management), and nothing more, and $800,000 was the amount owed, so that was the purchase price. Long and Huang wanted to avoid bankruptcy before the asset sale *in order to retain control of the technology*. There was no evidence that defendants evaluated whether bankruptcy would bring a higher price or attempted to see if any other potential buyers would offer a higher price for KatanaMe's assets or for the company

7

itself. Defendants did not seek any appraisal of KatanaMe assets. Huang testified that, because they were unable to get other companies to invest more money into the company, "$800,000 was the best deal we could get" for the intellectual property assets. Huang believed it was a fair offer because it was the only offer.

On February 18, 2005, Long sent KatanaMe shareholders a "Stockholder Update." The update represented that: (i) The company was in terrible financial shape and had closed down all operations and all product development back in mid-2004, because of lack of additional capital. Long stated, "In order to pay off its debt, the Company is currently seeking buyers for its assets, which consist mainly of the intellectual property rights associated with the Company's technology." (ii) KatanaMe was working to "sell the Company's assets for the best deal the Company can negotiate." (iii) KatanaMe could not raise any money. Defendants did not disclose their role in setting up Skipper Wireless, the asset purchaser.

Also on February 18, 2005, KatanaMe entered into a subordinated promissory note agreement with IT-Farm pursuant to which IT-Farm paid KatanaMe $32,000, which was used to pay for the prosecution of KatanaMe patents and to temporarily keep creditors from further prosecution of their claims.

As part of the sale of KatanaMe's assets, IT-Farm agreed to indemnify KatanaMe and its affiliates, officers, directors and employees from losses in connection with any claims related to the business, including claims by any current or former KatanaMe employees. The indemnification was subject to an $80,000 holdback. On or about March 18, 2005, KatanaMe's board (i.e., Long and Huang) voted to approve a sale of substantially all of the company's assets to Skipper Wireless. On or about March 21, Skipper Wireless extended "at-will" offers of employment to Long, Huang and Sayers. Long's offer included $130,000 annual salary,[2] plus benefits, six months of pre-vested stock options, plus additional options accruing at 1/48 of the total shares per month. Huang also received an offer of employment at an annual salary of $130,000, plus

_____

[2] According to the offer, Long's salary was to be increased to $180,000 after completion of financing anticipated for September 30, 2005.

8

benefits and potential bonuses and possible stock options based on development milestones. As part of the offers, Long was offered the title of chief operating officer of Skipper Wireless USA (a subsidiary of Skipper Wireless, established after sale of the assets and referred to as Skipper Labs or Skipper California), Huang was offered the title of senior vice president (SVP) of engineering of Skipper Labs, and Sayers was offered the title of SVP of systems of the new company.[3] On or about March 23, 2005, Long, Huang, and Sayers accepted the at-will offers of employment extended to them by Skipper Wireless. The prospective employment of Long, Huang, and Sayers offered by Skipper Wireless with Skipper Labs was disclosed to the full KatanaMe board, which consisted of Long and Huang.

On March 31, 2005, Long sent a letter to KatanaMe's stockholders describing the company's cessation of engineering development, its lack of success in locating either funding or buyers, and the offer from Skipper Wireless to purchase the company's intellectual property assets for $800,000—which would pay off most of KatanaMe's largest creditors, but not all. The March 31 letter was accompanied by a seven-page information statement that summarized the terms of the proposed Asset Purchase Agreement (APA), attached a copy of the APA, and requested that KatanaMe's stockholders consent to Long, Huang and Sayers being entitled to receive stock options from Skipper Wireless (collectively the "March package"). On April 1, 2005, Sylla wrote KatanaMe describing what he perceived to be deficiencies in the proposed APA. On April 6, 2005, KatanaMe became aware that Nintendo, the holder of 84.47 percent of KatanaMe's preferred stock, and 15 percent of the voting stock, wanted changes to the APA.

By April 6, 2005, KatanaMe had received shareholder consents from the majority of the shareholders to the proposed asset sale. Between April 6 and 12, 2005, KatanaMe revised the APA and finalized an Amended and Restated Asset Purchase Agreement

---

[3] Long testified he was employed by Skipper Labs as senior vice president of operations and marketing at a salary of $130,000, plus health benefits and shares in Skipper Wireless, the parent company.

(Amended APA) and circulated an email to Nintendo and all shareholders who had consented to the March package, explaining the changes to the terms of the proposed asset sale, attaching the Amended APA, and another round of blank shareholder consents. On April 13, 2005, Long and Huang as directors approved the Amended APA proposal. By April 14, KatanaMe had received written consents from KatanaMe's outstanding and issued common and preferred stockholders. According to Long, the asset sale received shareholder approval of 74 percent. On April 15, 2005, the date the sale closed, KatanaMe circulated the Amended APA proposal to the remaining KatanaMe shareholders who had not voted in favor of the initial APA, including Sylla, Peter Thornycroft, Hopkins Guy, Orrick Investments 2002, LLC, the Thomas-Stewart Family Trust and Inventech. On April 15, KatanaMe and Skipper Wireless executed the Amended APA and, on the same day effected the closing of the sale of KatanaMe's assets to Skipper Wireless.

At the request of Skipper Wireless's chairman, Long met with Mori of Mitsubishi/ Diamond Capital "several months" *before* its March 14, 2005 and April 14, 2005 investments in Skipper Wireless. According to Skipper Wireless's capitalization table, Mitsubishi/Diamond Capital invested a combined total of $1 million in Skipper Wireless *before* the April 15, 2005 asset sale.

From May 2005 to December 2007, Skipper Wireless invested approximately $9 million in developing the technology acquired from KatanaMe. Despite Skipper Wireless's investments and Skipper Labs's expenditure of time and resources, Skipper Wireless failed to commercialize any product, Skipper Labs ceased operations in March 2008, and both Skipper Wireless and Skipper Labs filed for bankruptcy protection. On August 7, 2009, Skipper Wireless shareholders approved the sale of all assets (including what had been the former KatanaMe technology) to Tadaaka Chigusa for $36,000. (Chigusa, though his company Inventech, had controlled 12.96 percent of KatanaMe's series A preferred stock). According to Sylla, KatanaMe had eight patents issued at the time of trial, all of which are assigned to and now belong to Chigusa. Huang testified

10

that three patents were issued in late 2009 or early 2010 and are owned by Chigusa, although Huang is listed on at least one.

### E.  *This Lawsuit*

On September 20, 2005, Sylla filed this derivative action.[4]  On May 24, 2006, he filed his second amended complaint.

From May 9 through 20, 2011, the court held a bench trial on the derivative claims against Long and Huang.  The court issued a 56-page final statement of decision on January 9, 2012.  On February 14, the court granted Sylla's motion to sever the derivative claims and for entry of judgment in favor of Sylla on the derivative claim.  On March 16, the court denied defendants' new trial motion.  On March 22, the trial court entered judgment against defendants in the amount of $2.2 million, and found Sylla entitled to his statutory costs.  The court retained jurisdiction over future motions related to attorney fees and nonstatutory costs.  In its statement of decision, the court denied Sylla's motion for prejudgment interest.  On April 23, 2012, the court denied defendants' motion to vacate the judgment.  This timely appeal by defendants and cross-appeal by Sylla followed.

**1.  *Trial court's findings on liability.***  In its final statement of decision, the court observed that Sylla had asserted the same acts and transactions constituted a breach of the duty of loyalty, breach of the duty of good faith, and breach of the duty of due care by defendants Long and Huang.  The court concluded that the claim of the breach of the duty of due care was moot as plaintiff sought only monetary damages and the KatanaMe articles of incorporation included a provision eliminating the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director pursuant to title 8 of the Delaware Code [Corporations],

---

[4] Sylla also re-filed his individual employment claims as part of that complaint. The court bifurcated the derivative claims at issue here and entered a separate judgment on them.  Respondent relates that the trial court appointed a receiver for KatanaMe and the employment claims were settled with court approval.

section 102, subdivision (b)(7).[5] That provision specifically excludes from its coverage breaches of the director's duty of loyalty and for acts or omissions not in good faith.[6]

The trial court found Sylla had proven by a preponderance of the evidence that the director defendants Huang and Long acted in breach of their fiduciary duties of loyalty and good faith such that the business judgment rule presumption had been rebutted and the burden shifted to defendants to demonstrate the "entire fairness" of the asset sale transaction.

The court found Huang and Long breached their fiduciary duty of disclosure to the minority shareholders of KatanaMe and that "[t]his constitute[ed] a violation of the fiduciary duty of loyalty and/or good faith," sufficient to overcome the business judgment rule presumption and to shift the burden to defendants to prove entire fairness. The court further found that even if full disclosure of all material facts had been timely and properly disclosed, "the transaction would still have gone forward, because the controlling and *self-interested* shareholders, namely Huang, Long, and Sayers, along with controlling preferred stock holder Nintendo, all of whom already agreed to the transaction (regardless of the disclosures), were sufficient shareholdings to provide a majority vote in favor of the sale of KatanaMe's assets—a majority of the total shareholders, a majority of the common stock holders, and a majority of the preferred shareholders." (Italics added.)

---

[5] All statutory references are to title 8 of the Delaware Code, unless otherwise indicated.

[6] Section 102, subdivision (b)(7), provides in relevant part:

" (b) In addition to the matters required to be set forth in the certificate of incorporation by subsection (a) of this section, the certificate of incorporation may also contain any or all of the following matters: [¶] . . . [¶]

"(7) A provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under § 174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit. . . ." (Del. Code, tit. 8, § 102.)

12

However, the court also determined that defendants were *not* shielded from liability in this case by the vote of a majority of the *disinterested* shareholders, as the asset sale was *required* to be approved or ratified by a shareholders' vote and so did not come within the safe harbor protection of the doctrine. Moreover, the vote was not an informed one because of the lack of disclosure of material facts and because individual minority shareholders were given additional information on the transaction orally by Long, which information was not given to other shareholders—promises of potential benefits in the future if they would agree to the transaction.

The court found Huang and Long "failed to prove by a preponderance of the evidence the asset sale transaction, whereby nearly all assets of KatanaMe, including all of its intellectual property and pending patents, were sold to Skipper Wireless Inc. for $800,000, was 'entirely fair' to the corporation and its shareholders."

## DISCUSSION

## I. Fiduciary Duties

Defendants contend the trial court misapplied Delaware's duty of disclosure law to find breach of both the duty of loyalty and the duty of good faith. Consequently, defendants argue, the court erred in refusing to apply the business judgment rule and in shifting the burden to defendants to show the asset sale was entirely fair.

### A. *Standards of Review*

Generally, appellate courts independently review questions of law and apply the substantial evidence standard to a superior court's findings of fact. (See *Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 801 [questions of law are subject to independent review]; *Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [substantial evidence rule].) The substantial evidence standard of review has been described by our Supreme Court as follows: "Where findings of fact are challenged on a civil appeal, we are bound by the 'elementary, but often overlooked principle of law, that . . . the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the findings below. [Citation.] We must therefore view the evidence in the light most favorable to the prevailing party,

13

giving it the benefit of every reasonable inference and resolving all conflicts in its favor in accordance with the standard of review so long adhered to by this court." (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660.)  We do not reweigh the evidence or evaluate the credibility of witnesses, but rather we defer to the trier of fact.  (*Lenk v. Total–Western, Inc.* (2001) 89 Cal.App.4th 959, 968.)

**B.**      ***Fiduciary Duties***

The business judgment rule "presumes that 'in making a business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company.'  [Citation.]  Those presumptions can be rebutted if the plaintiff shows that the directors beached their fiduciary duty of care or of loyalty or acted in bad faith.  If that is shown, the burden then shifts to the director defendants to demonstrate that the challenged act or transaction was entirely fair to the corporation and its shareholders." (*In re Walt Disney Co. Derivative Litigation* (Del. 2006) 906 A2d 27, 52 (*Disney*).)

**1.**  ***Duty of loyalty.***  As explained in Balotti and Finkelstein's "Delaware Law of Corporations and Business Organizations" (Aspen 2013) section 4.16 (Balotti and Finkelstein):  "Directors owe a duty of loyalty to the corporation, and this duty is a companion obligation to the duty of care.  [Citation.]  These duties are based on the fact that the directors are duty-bound to the true owners of the corporation, the stockholders.  [Citation.] . . . The duty of loyalty both forbids directors to 'stand on both sides' of a transaction and prohibits them from deriving 'any personal benefit through self-dealing.'  [Citation.]  In effect, it mandates that a director not consider or represent interests other than the best interests of the corporation and its stockholders in making a business decision.  [Citation.]  The duty of loyalty also 'encompasses cases where the fiduciary fails to act in good faith,' including the duty of oversight.  [Citation.]  A court may nevertheless find a duty-of-loyalty violation even where the fiduciary subjectively acted in good faith.  [Citation.]" (Fns. omitted.)

Where questions regarding the duty of loyalty arise, "[t]he procedural considerations that often determine these substantive issues are highlighted by the

14

following inquiries: 'Was adequate disclosure made to the decision maker? Did the alleged conflict of interest transaction receive independent scrutiny? Who has the burden of proving that the duty of loyalty has been breached? Is the transaction fair? [Citation.]" (Balotti and Finkelstein, *supra,* § 4.16.) "While the general concept underlying the duty of loyalty—that a director refrain from self-dealing—is simple, application of the loyalty principle can be difficult, especially in complex transactions involving corporate control. In such circumstances, this application can become a *highly fact-intensive exercise*." (Balotti and Finkelstein, *supra,* § 416, italics added, fns. omitted.)

"When directors do not act 'fairly' in structuring a transaction, they breach their duty of loyalty, and the result may be either an injunction or damages. In *Strassburger* [*v. Earley* (Del. Ch. 2000) 752 A.2d 557], for example, the Court of Chancery held that directors may be held personally liable for breach of their duty of loyalty even if they do not personally benefit from the breach. [(*Id.* at p. 581.)]" (Balotti and Finkelstein, *supra,* § 4.16, fns. omitted.)

**2. *Duty of good faith.*** The duty to act in good faith is a subsidiary element of the duty of loyalty and "a failure to act in good faith is not conduct that results, *ipso facto*, in the direct imposition of fiduciary liability. [Citation.] The failure to act in good faith may result in liability because the requirement to act in good faith 'is a subsidiary element[,]' i.e., a condition, 'of the fundamental duty of loyalty.' [Citation.]" (*Stone ex rel. AmSouth Bancorporation v. Ritter* (Del. 2006) 911 A.2d 362, 369-370, fns. omitted (*Stone*); see Balotti and Finkelstein, *supra,* § 3:2, fns. omitted.) Breach of the duty of good faith "cannot result in direct liability, but instead may serve to shift the presumption of the business judgment rule or to support a claim for breach of the duty of loyalty." (Balotti and Finkelstein, § 4.17, fns. omitted.)

Subjective bad faith is not necessary to breach the duty of good faith, although they may overlap in some cases. Breach of the duty of good faith lies somewhere between lack of due care or gross negligence and subjective bad faith. (*Disney, supra,* 906 A.2d at p. 66.) Intentional dereliction of duty or conscious disregard for one's

15

responsibilities is "properly treated as a non-exculpable, nonindemnifiable violation of the fiduciary duty to act in good faith." (*Ibid.*)

" 'A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties. There may be other examples of bad faith yet to be proven or alleged, but these three are the most salient.' [Citation.]" (*Stone, supra,* 911 A.2d at p. 369, quoting *Disney, supra,* 906 A.2d at p. 67.)[7]

**3. *Duty of disclosure.*** The duty of disclosure is not a separate fiduciary duty, but stems from the fiduciary duties of care and loyalty. (Balotti and Finkelstein, *supra,* § 4.18.) "Disclosure violations may, but do not always, involve violations of the duty of loyalty. A decision violates only the duty of care when the misstatement or omission was made as a result of a director's erroneous judgment with regard to the proper scope and content of disclosure, but was nevertheless made in good faith. Conversely, where there is reason to believe that the board lacked good faith in approving a disclosure, the violation implicates the duty of loyalty." (*In re Tyson Foods, Inc. Consol. Shareholder Litig.* (Del.Ch. 2007) 919 A.2d 563, 597-598; Balotti and Finkelstein, § 4.18, fns. omitted.)

---

[7] "This view of a failure to act in good faith results in two additional doctrinal consequences. First, although good faith may be described colloquially as part of a 'triad' of fiduciary duties that includes the duties of care and loyalty [citation], the obligation to act in good faith does not establish an independent fiduciary duty that stands on the same footing as the duties of care and loyalty. Only the latter two duties, where violated, may directly result in liability, whereas a failure to act in good faith may do so, but indirectly. The second doctrinal consequence is that the fiduciary duty of loyalty is not limited to cases involving a financial or other cognizable fiduciary conflict of interest. It also encompasses cases where the fiduciary fails to act in good faith. As the Court of Chancery aptly put it in *Guttman* [*v. Huang* (Del.Ch. 2003)] 823 A.2d 492, 506, fn. 34], '[a] director cannot act loyally towards the corporation unless she acts in the good faith belief that her actions are in the corporation's best interest.' [Citation.]" (*Stone, supra,* 911 A.2d at pp. 369-370, fns. omitted.)

"It is well-settled law that 'directors of Delaware corporations [have] a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action.' [Citation.] " (*Gantler v. Stephens* (Del. 2009) 965 A.2d 695, 710, quoting *Stroud v. Grace* (Del. 1992) 606 A.2d 75, 84, fns. omitted.) "That duty 'attaches to proxy statements and any other disclosures in contemplation of stockholder action.' [Citations.]" (*Gantler v. Stephens,* at p. 710, fn. omitted.) "Directors are required to provide shareholders with all information that is material to the action being requested and to provide a balanced, truthful account of all matters disclosed in the communications with shareholders." (*Malone v. Brincat* (Del. 1998) 722 A.2d 5, 12.)

"An omitted fact is *material* if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. . . . It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused a reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. *Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.*" (*Arnold v. Society for Savings Bancorp, Inc.* (Del. 1994) 650 A.2d 1270, bolding omitted, italics added (*Arnold*); see e.g., *Gantler v. Stephens, supra,* 965 A.2d at p. 710.)

### II. Breach of the Duty of Disclosure

**1. *Breach of the duty of disclosure implicates the duty of loyalty here.*** The trial court recognized that "[a]s a corollary to the duty of loyalty, the Delaware courts hold that it includes a duty of disclosure. . . . [T]he failure of the Director Defendants to meet their duty of disclosure bears on the issue of whether they acted in accordance with their fiduciary duty of loyalty to the corporation, and specifically whether they obtained a fair price for the sale of substantially all of the corporation's assets."

In arguing that the court misapplied Delaware's duty of disclosure law, defendants first contend a breach of the duty of disclosure *is not* a breach of the duty of loyalty and

that a breach of good faith must still be proven. As they do throughout this appeal, defendants attempt to isolate each particular dereliction of duty by Long and Huang and contend it is not sufficient, while ignoring the whole complex pattern of behavior that the court found in this case amounted to breach of the duties of good faith and loyalty.

"The 'duty of disclosure is not an independent duty, but derives from the duties of care and loyalty.' [Citation.] The duty of disclosure arises because of 'the application in a specific context of the board's fiduciary duties . . . .' [Citation.] Its scope and requirements depend on context; the duty 'does not exist in a vacuum.' [Citation.] When confronting a disclosure claim, a court therefore must engage in a contextual specific analysis to determine the source of the duty, its requirements, and any remedies for breach. [Citation.]" (*In re Wayport, Inc. Litigation* (Del. Ch., May 1, 2013) ____A3d ____, 2013 WL 5345477, *14.)

Defendants rely on *Arnold, supra,* 650 A.2d 1270 and *Zirn v. VLI Corp* (Del. 1996) 681 A.2d 1050 (*Zirn*) for the proposition that a breach of the duty of disclosure does *not* amount to a breach of the duty of loyalty. Neither case assists them.

*Arnold, supra,* 650 A.2d 1270, held a violation of the duty of disclosure does not *necessarily* amount to a breach of the duty of loyalty. (*Cinerama, Inc. v. Technicolor, Inc.* (Del. 1995) 663 A.2d 1156, 1163, fn. 9 (*Cinerama*).) The *Arnold* court concluded that the "individual defendants did not violate the duty of loyalty under the facts of this case" (*Arnold,* at pp. 1287-1288) and that "on this record, the single disclosure violation which we have found was consistent only with a good faith omission." (*Id.* at p. 1288, fn. 36.) That a violation of the duty of disclosure does not *necessarily* amount to a breach of the duty of loyalty does not mean that such violation *cannot* support a finding of breach of the duty of loyalty where circumstances warrant.

*Zirn, supra,* 681 A.2d 1050, held it materially misleading to advise stockholders in a tender offer transaction that patent counsel had stated there was a significant possibility the patent office would not reinstate a lapsed patent on a critical product, while not informing them that patent counsel had also stated ultimate success was "likely." The court concluded from the record that the statement was made in good faith. (*Id.* at

18

p. 1053.) According to the court: "The record reveals that any misstatements or omissions that occurred were made in good faith. The VLI directors lacked any pecuniary motive to mislead the VLI stockholders intentionally and no other plausible motive for deceiving the stockholders has been advanced. A good faith erroneous judgment as to the proper scope or content of required disclosure implicates the duty of care rather than the duty of loyalty. [Citation.] Thus, the disclosure violations at issue here fall within the ambit of the protection of section 102(b)(7)." (*Id.* at pp. 1061-1062, fn. omitted, citing *Arnold, supra,* 650 A.2d at pp. 1287-1288 and fn. 36.)

In contrast, the trial court's factual findings in the instant case make it clear the court found not a single, material misstatement made in good faith, but numerous material misstatements and nondisclosures made by defendant board members in connection with the sale of KatanaMe's assets to Skipper Wireless.

The court found the February 18, 2005 "Stockholder Update" to KatanaMe shareholders was materially false in numerous respects. Defendants were not "currently seeking buyers" for the corporate assets. As of that date, Long and Huang had done nothing to find buyers for the assets, but had already worked out an arrangement behind the scenes to sell all the assets to IT-Farm or a new company to be funded and created by IT-Farm for the price of KatanaMe's existing debt to outside creditors (including IT-Farm and including its lawyers at Orrick who were putting together the deal).

The representation that KatanaMe was working to "sell the Company's assets for the best deal the Company can negotiate," was also materially false. "[T]he only directors of KatanaMe[, Long and Huang,] were not involved in the negotiation of the price or terms for sale of assets. Defendants presented no evidence at trial that they worked to *negotiate* the best possible price for [KatanaMe's] intellectual property and other assets—rather, the evidence is that there were no arms' length negotiations on price."

The court further found the March 2005 shareholder information statement recommending that stockholders approve the APA and the sale of corporate assets, "consent" to Long, Huang, and Sayers' receiving stock options from buyer Skipper

Wireless, and waive the required notice period for preferred shareholders, was materially false and misleading. It failed to disclose that Long and Huang already knew and planned, with the IT-Farm principals, that KatanaMe would file for bankruptcy after the asset sale in order to wipe out the stockholdings of the noncontrolling shareholders. It failed to disclose that defendants had already accepted employment with Skipper. It failed to disclose that defendants had no factual or reasonable basis to believe the asset sale as proposed " 'provides consideration representing a just, fair and reasonable price for the security holders of KatanaMe,' " especially as defendants had taken no action to further negotiate with ATA, to obtain an independent valuation of the company's assets, to solicit purchase of the company itself, to find other buyers, to seek competitive bids for the sale of company assets, or to personally participate in the negotiation of the terms of sale to IT-Farm/Skipper Wireless, but rather, had delegated that duty to Matsumoto.

The shareholder information statement also stated that in addition to other requirements, approval by a majority of disinterested shareholders was required for the asset sale to be consummated. This was materially false. Under section 271, subdivision (a), an affirmative vote of a majority of the common shareholders was required and pursuant to the amended articles of incorporation of KatanaMe, a vote of the holders of a majority of the Series A preferred shares was also required to approve the sale of assets. The court found that the disinterested shareholder provision was only put into the information statement for the benefit of the director defendants, to give them the protection of Delaware law providing that ratification of a board of director's decision by a majority of disinterested shareholders may act as a safe harbor in situations where directors' conflicts of interest are at issue, such that the business judgment rule presumptions would still apply.

The court also found Long's March 31, 2005 personal cover letter to KatanaMe shareholders was materially false and misleading, in that: he never disclosed that he had *already* accepted employment with Skipper on March 23; he was to officially start working for Skipper as of April 4, 2005; he had an agreement to be chief operating officer of Skipper operations in the United States; he was receiving an initial salary of

20

$130,000, plus potential bonuses and stock options, including already having received six months pre-vesting in options for Skipper common stock. The letter also falsely represented that efforts had been made since June 2004 to find buyers for KatanaMe, where in fact there were no such efforts. On the contrary, the board's efforts were toward finding additional investment and funding only. Further, shareholders were not informed of the lack of true negotiation of the asset sale price.

The revised, corrected and amended letter (not correcting the foregoing material false statements) and Amended APA was *sent only to those shareholders who had already given their consent to the transaction*, except for Sylla and Nintendo, who had demanded changes. This information was not disseminated to the other minority shareholders until after a majority of shareholders had already voted to approve the asset sale, on the day the sale closed. The court found defendants provided no reasonable explanation why all shareholders did not receive all of the communications and information at the same time.

Also not disclosed to KatanaMe shareholders was information that on April 13, 2005, Long, Huang, Sayers and others attended an "all hands" meeting of Skipper Wireless, where it was announced that Long would be senior vice president of operations for Skipper Labs and Huang would be senior vice president of engineering for Skipper Labs and that the goal was to complete the KitKat prototype by November 7, 2005, or that Long had made a presentation to Diamond Capital/Mitsubishi some months before April 15th, resulting in the latter's commitment to invest in Skipper.

The court could well determine on this record, as it did, that these numerous material misstatements and failures to disclose by defendants constituted both a breach of the duty of loyalty and a breach of the duty of good faith.

**2. *Misstatements and omissions.*** Defendants next contend as a matter of law that they made *no* false statements or omissions of material facts.

Defendants first maintain the court's finding that the statements KatanaMe was "currently seeking buyers for its assets" and that defendants were working "to sell the Company's assets for the best deal the Company can negotiate" were not false, because

KatanaMe had offered to sell Nintendo half ownership in its patents for $4.5 million, defendants had offered to sell Nintendo a controlling share of KatanaMe, and defendants had made numerous efforts to find investors.

Substantial evidence supports the findings of the court that such statements were materially false, as the record supports the court's findings that Huang and Long did not work to find *buyers for the company itself*, that is, an acquisition of KatanaMe by purchase of *all outstanding stock*. As the court observed, such a transaction potentially would have provided compensation to all KatanaMe shareholders, whether cash or exchange of stock, *plus* given the KatanaMe shareholders their statutory rights to an appraisal if they were unhappy with the purchase price. Instead, defendants continued to pursue others to *invest* in the corporation. As the court observed, these are not the same thing. Substantial evidence also supports the court's finding that Huang and Long did not seek to find a buyer for the KatanaMe assets, particularly the intellectual property and technology. Indeed, as late as November 2004, defendant "Huang told Intel 'we are not selling our IP.' [Citation.]"

Substantial evidence also supports the court's finding that assertions by Long and Huang that they were working to secure the "best deal the Company can negotiate" for sale of KatanaMe assets had "no factual foundation, because neither one of them was involved at all in the negotiation *of price*." (Italics added.) Rather, substantial evidence supports the court's finding that defendants were not involved in the negotiation of the price or terms for sale of KatanaMe's intellectual property or other assets, but left it to Matsumoto (Nintendo representative and a founding member of Skipper Wireless) to communicate with IT-Farm regarding the deal. The court found this delegation of all key negotiations regarding the sale of KatanaMe assets was an improper delegation of powers by Long and Huang.

Defendants contend the record does not support the finding that defendants left it to Matsumoto to negotiate the price. They argue that Long and his attorneys were negotiating a deal at arm's length with Takeshi Nakabayashi of IT-Farm and his lawyers. We disagree. Huang testified that he never was involved in any way with the actual

22

negotiations between Skipper and KatanaMe. hat Matsumoto provided the documents that were exchanged between KatanaMe and IT-Farm preliminary to any discussion of the asset purchase, because Matsumoto was the person interfacing with Nintendo and KatanaMe and that Matsumoto had taken it upon himself to try to get funding from IT-Farm, because Long did not speak Japanese. This evidence supports the inference drawn by the court that defendants left any price negotiations to Matsumoto. The exhibits to which defendants point as evidence that Long did negotiate with IT-Farm do not indicate any *negotiation* concerning the assets' *price*. Rather, they deal primarily with setting up and funding Skipper Wireless and supplying information to IT-Farm regarding the amounts KatanaMe owed creditors. Further, when asked about negotiations with IT-Farm, Long testified that IT-Farm asked KatanaMe for a list of KatanaMe's creditors and what was owed them and IT-Farm stated they would only pay off the $800,000 owed to creditors. No attempt was made to value the assets. The only arguable attempt to negotiate anything by Long appears to be his request to structure any accrued salary payment as a signing bonus or stock in the new company. However, even in that communication, Long made clear the request was not part of any negotiation and that whatever IT-Farm decided to do was fine.

Defendants further argue that plaintiff had the affirmative obligation to prove that Long and Huang falsely claimed they had obtained the "best price" and they urge that plaintiff produced no evidence that $800,000 was not the best price. They assert the trial court's rejection of defendants' expert's opinion that the fair market value of KatanaMe at the time was "no more than $800,000 was arbitrary," but they fail to recognize the specific respects in which the court found that expert testimony wanting. (See discussion, *post*, at pages 40-42.) In any event, the court's rejection of the expert testimony goes more to the question of the "entire fairness" of the transaction and to the issue of damages than to the issue of breach of the duty of disclosure. The question here is whether the court's findings as a whole are supported by substantial evidence and whether the findings support the court's ultimate findings that defendants breached their fiduciary duties.

23

The court found the information statement and accompanying package and letter from Long were inadequate and materially false in stating, among other things, that KatanaMe would likely go into bankruptcy if the asset sale were *not* approved and that the asset sale transaction " 'provide[d] consideration representing a just, fair and reasonable price for the security holders of KatanaMe,' "  The March package was materially false and misleading as it *failed to disclose* that Long and Huang *already* planned with IT-Farm principals that KatanaMe would file for bankruptcy *after* the asset sale in order to wipe out stockholdings of the non-controlling shareholders, failed to disclose that defendant directors (who were the only two directors left to "unanimously recommend" stockholder consent to the asset sale) had already accepted employment with Skipper Wireless, and failed to disclose that defendants had "no factual or reasonable basis to believe the Asset Sale as proposed 'provides consideration representing a just, fair and reasonable price for the security holders of KatanaMe.' "  Substantial evidence of all of the above is found in the record, including Long's "task" list showing the planned bankruptcy filing after the asset sale, testimony that no valuation of the assets was performed, and evidence that defendants did not seek to sell the company or all of its assets to any company other than to Skipper Wireless, the company they helped establish solely to purchase the assets and in which they would continue to have a stake, as employees, executives, and shareholders.

Defendants further maintain that the trial court made *no* finding that the statements or omissions were made in bad faith and rely on the truism that an "inadequate or flawed" effort to carry out one's fiduciary duties is not a breach of the duty of good faith. (*Lyondell Chem. Co. v. Ryan* (Del. 2009) 970 A.2d 235, 243 (*Lyondell*).)  First, we disagree with defendants that the court was required to specifically find a particular material misrepresentation was made in bad faith in order to support the judgment.  We observe that the *Lyondell* court concluded "the record establishes that the directors were disinterested and independent" and that there was "no evidence . . . from which to infer that the directors knowingly ignored their responsibilities, thereby breaching their duty of loyalty." (*Id.* at p. 237.)  That is not the case here.  Substantial evidence supports the

court's finding that Long and Huang were "self-interested" in the sales transaction. On the evidence presented, the court properly determined that Long and Huang were far less interested in securing a fair price to the shareholders for the assets than in securing jobs for themselves (including salaries and benefits) and a place in the management structure of a new corporation that would continue the research and development of the intellectual property and that would provide defendants with stock and stock options in the new corporation.

Defendants contend there was no evidence of their specific financial circumstances such that they would be motivated to approve the sale by their own personal financial interests. Such a showing was not required in order for the court to draw the reasonable inference from the evidence that defendant directors were "not disinterested" in the transaction.

The court's findings of numerous instances of defendants' breach of their duty of disclosure, its finding that defendants were "self-interested" in the transaction, and its finding that defendants' breach of the duty of disclosure constituted a breach of both the duty of loyalty and the duty of good faith sufficient to overcome the presumptions of the business judgment rule, were more than adequate on this record.

Defendants contend that asking for approval of the asset sale by a majority of disinterested shareholders cannot be a false statement in this context because defendants were not purporting to represent what the law required. We disagree. The March 30, 2005 information statement sent to shareholders stated under the caption "The Asset Sale" the following: "The affirmative vote of the holders of (i) a majority of Seller's outstanding capital stock, (ii) a majority of Seller's outstanding shares of Preferred Stock, voting as a single class, and (iii) a majority of the stockholders of KatanaMe (holders of both common stock and preferred stock) who are not parties to the Related Party Transaction voting together as a single class are *required* to approve and adopt the Purchase Agreement and the Asset Sale." (Italics added.) The foregoing appears to set forth legal requirements for approval of the asset sale, bundling the "disinterested shareholder requirement" together with approvals required by Delaware law and the

25

KatanaMe articles of incorporation in such a way that a reasonable shareholder would believe that the vote of a disinterested shareholder was required by law.

The court did not abuse its discretion in determining this falsehood was material in that it was "only put into the letter to shareholders for the benefit of the Director Defendants," who were attempting to secure the protection of Delaware law providing that shareholder ratification of a board's decision by a majority of disinterested shareholders may act as a safe harbor and trigger the presumptions of the business judgment rule where directors' conflicts of interest are at issue, as they were in this transaction.  As the court recognized, the disinterested shareholder ratification provision does *not* protect directors under the business judgment rule where the decision or transaction is *required* to be approved or ratified by a vote of the shareholders.  (*Gantler v. Stephens, supra,* 965 A.2d at pp. 712-713 [the sale of substantially all corporate assets and the waiver of notice rights require shareholders' voting approval—and thus cannot be the basis of "ratification" under the common law].)  Further, we agree with the court that there was a "substantial likelihood" that this information, particularly when viewed together with the other material misstatements and omissions by defendants, "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  (*Arnold, supra,* 650 A.2d at p. 1277.)

Defendants counter that when a majority of disinterested shareholders approve a transaction, it is subject to review under the business judgment standard pursuant to statute (§ 144[8]), rather than under common law.  They rely upon section 144 and cases

---

[8] Section 144 provides in relevant part:
"(a) No contract or transaction between . . .   a corporation and any other corporation . . . in which 1 or more of its directors or officers, are directors or officers, or have a financial interest, *shall be void or voidable solely for this reason,* or solely because the director or officer is present at or participates in the meeting of the board or committee which authorizes the contract or transaction, or solely because any such director's or officer's votes are counted for such purpose, if:
"(1) The material facts as to the director's or officer's relationship or interest and as to the contract or transaction are disclosed or are known to the board of directors or the committee, and the board or committee in good faith authorizes the contract or

26

involving the question of ratification by disinterested directors, not shareholders. They argue *Gantler v. Stephens, supra,* 965 A.2d 695, applies only to the common law doctrine of ratification, as the court in that case specifically disavowed any intent to change the statutory rule. (*Id.* at p. 713, fn. 54.) Defendants' argument is meritless.

"Section 144 of the General Corporation Law of the State of Delaware was adopted for a limited purpose: to rescue certain transactions, those in which the directors and officers of a corporation have an interest, from per se *voidability* under the common law. That is all. Under its plain language, section 144 plays no part in validating transactions or in ensuring the business judgment rule's application. Over time, however, practitioners and courts have suggested a broader role for section 144, linking the statute to the common-law analysis of interested transactions." (Rohrbacher, Zeberkiewicz & Uebler, *Finding Safe Harbor: Clarifying the Limited Application of Section 144* (2008) 33 Del. J.Corp.L. 719, 720, italics added.) "[I]f a transaction complies with the section 144 safe harbor, it will not be invalidated solely on the grounds of the offending interest, but will be analyzed under the common law regarding breach of fiduciary duty. Section 144 will then have nothing more to do with the transaction. If, by contrast, the transaction fails to comply with section 144, it will be analyzed under both the common law regarding voidability and the common law regarding breach of fiduciary duty." (*Id.* at p. 221.)[9]

---

transaction by the affirmative votes of a majority of the disinterested directors, even though the disinterested directors be less than a quorum; or
"(2) *The material facts as to the director's or officer's relationship or interest and as to the contract or transaction are disclosed or are known to the shareholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the shareholders; or*
"(3) The contract or transaction is fair as to the corporation as of the time it is authorized, approved or ratified, by the board of directors, a committee or the shareholders.
"(b) Common or interested directors may be counted in determining the presence of a quorum at a meeting of the board of directors or of a committee which authorizes the contract or transaction." (Italics added.)
[9] The cases upon which defendants rely, *Benihana of Tokyo, Inc. v. Benihana, Inc.* (Del. 2006) 906 A.2d 114, 120 and *Cede & Co. v. Technicolor, Inc.* (Del. 1993) 634 A.2d

27

Furthermore, section 144 allows ratification by disinterested shareholder approval only when the "*material facts as to the director's or officer's relationship or interest and as to the contract or transaction are disclosed or are known to the stockholders entitled to vote thereon, . . .*" (§ 144, subd. (a)(2).) The court here determined, and we agree, that material facts as to defendants' interest in the transaction were not fully disclosed or known to the shareholders. Finally, we note the court's finding that three individual minority shareholders were given additional information on the transaction orally by Long. This information was not told to other shareholders. Long held out the promise of potential benefits that could not be shared-in by other shareholders in the future if these few would agree to the transaction and waivers.[10] Ultimately, the three received nothing.

3. *Materiality.* Defendants challenge the court's finding that defendants' failure to disclose they had already accepted employment with Skipper Wireless, their failure to disclose their titles, salary and details of their receipt of stock options, and their failure to disclose that KatanaMe would file for bankruptcy were *material* omissions. They contend such failures to disclose were not material *as a mater of law*. They argue that plaintiff here failed to "demonstrate 'a substantial likelihood that the disclosure of the

---

345, 366, fn. 34 (*Cede*), modified on other grounds in *Cede & Co. v. Technicolor, Inc.* (Del. 1994) 636 A.2d 956 (*Cede II*), involve purported ratification by disinterested board members who were *fully informed* about the transaction. In *Cede,* the question was whether, in light of a charter requirement of director unanimity, the chancellor's finding of board approval of the sale by an overwhelming vote of disinterested directors was sufficient to support a finding that the board had met its duty of loyalty. The court declined to address this question in the first instance and until the implications of section 144, subdivision (a) were addressed by the court below.

[10] Common stock shareholder John Emery testified he and two other KatanaMe shareholders met periodically with Long, who provided updates on KatanaMe. Long told them they needed to sign shareholder consents to the sale to Skipper Wireless. Long told them he could not guarantee it, but that he would try to get the three some stock in the new company. He assured them that "family" would be taken care of, but they had to keep it quiet because it was not "proper procedure" and Long would not be able to "take care" of all of the KatanaMe investors. Emery would not have consented to the transaction had he known the truth. Later, Long also told Emery that "it was all over" and they would get nothing. Long also falsely told Emery that KatanaMe was in bankruptcy and all debts had been discharged *before* any bankruptcy had been filed.

28

omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.' [Citation.]" (*Gantler v. Stephens, supra,* 965 A.2d at p. 710.)  Again, we disagree.

In *Gantler v. Stephens, supra,* 965 A.2d at page 711, the court determined that a statement by the board that they had " 'careful[ly] deliberat[ed]' " was a representation to shareholders that the board had considered the sales process on its objective merits and had determined that reclassification of shares in that case would better serve the company than a merger.  The court found such statement *material* even though the defendant fiduciaries had disclosed their admitted conflict of interest.  "Given the defendant fiduciaries' admitted conflict of interest, a reasonable shareholder would likely find significant—indeed, reassuring—a representation by a conflicted Board that the Reclassification was superior to a potential merger which, after 'careful deliberations,' the Board had 'carefully considered' and rejected.  In such circumstances, it cannot be concluded as a matter of law, that disclosing that there was little or no deliberation would not alter the total mix of information provided to the shareholders." (*Id.* at p. 711.)  As indicated by the court in *Gantler v. Stephens,* depending upon the circumstances presented, the question whether a reasonable shareholder would likely find significant a particular statement or omission material may be a factual determination.  (See *Gilliland v. Motorola, Inc.* (Del. 2004) 859 A.2d 80, 88 [adequacy of disclosure and materiality "inquiry is highly contextual"].)

In the circumstances here, we believe the question of materiality is an aspect of the "highly fact-intensive exercise" in which the court must engage to determine the question whether the directors breached their duty of loyalty.  (See Balotti and Finkelstein, *supra,* § 4.16; *Cede II, supra,* 636 A.2d 956, 957 ["We must defer to the factfinder on a mixed question of fact and law, as to which reasonable minds may differ on the question of *materiality*. [Citation.]"].)

We conclude the court properly determined the foregoing nondisclosures were material.  Given defendants' admitted conflicts of interest in the transaction, there is substantial reason to believe that disclosure of the *extent* of their conflicts—that they had

*already* accepted employment with Skipper Wireless, that Long had begun working for Skipper as of April 4th, that Long had an agreement to be chief operating officer (or senior vice president of operations and marketing) of Skipper operations in the United States, that Huang had accepted the position of senior vice president of engineering, and that they were receiving salaries of $130,000, plus potential bonuses and were receiving six months pre-vesting in options for Skipper—would have been significant to a reasonable shareholder in evaluating the truth of defendants' material misrepresentation that the consideration to be received for the proposed asset sale represented "a just, fair and reasonable price for the security holders," and that the undisclosed information would have altered that shareholder's view of the "total mix" of information made available.

### III.  Breach of the Duty of Loyalty

The foregoing breaches of the duty of disclosure were sufficient to support the court's findings that defendants breached their fiduciary duties of loyalty and good faith. Defendants contend that their actions, apart from their material misstatements and nondisclosures, did not support the finding that they breached their duty of loyalty. Again, defendants "cherry pick" from the court's findings, arguing that the fact defendants accepted employment offers from Skipper Wireless "is not enough"; that they did not seek to sell all of KatanaMe's assets at some prior point or to declare bankruptcy is "insufficient"; and that Long's belief he had a duty to creditors is "no basis for finding a breach of loyalty."  Finally, defendants contend the disinterested shareholder approval of the transaction eviscerates any duty of loyalty claim.

That any particular action may not have amounted to a breach of the duty in other circumstances, does not undermine the court's determination that in the circumstances here presented, defendants breached their duty of loyalty.

The duty of loyalty owed by a director to the corporation and its shareholders was described by the Delaware Supreme Court in *Cede, supra,* 634 A.2d 345:  "Essentially, the duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling

30

shareholder and not shared by the stockholders generally. [Citations.] [¶] Classic examples of director self-interest in a business transaction involve either a director appearing on both sides of a transaction or a director receiving a personal benefit from a transaction not received by the shareholders generally. [Citations.]" (*Id.* at pp. 361-362, fns. omitted.)

Substantial evidence supported the court's determination that the actions of defendant directors in this case did not comport with those standards and constituted a breach of the duty of loyalty.

Contrary to defendants' contention, acceptance of employment offers with a purchasing or acquiring company is *not as a matter of law, insufficient* to constitute a conflict of interest or a breach of the fiduciary duty of loyalty. In support of the proposition that "Long's and Huang's offers of employment with Skipper Wireless do not, as a matter of law, establish a breach of the duty of loyalty," defendants cite an unpublished opinion of the Delaware chancery court, *In re Western National Corporation Shareholders Litigation* (Del. Ch., May 22, 2000) 2000 WL 710192. However, in that case, the chancery court found that plaintiff *had* established triable issues of fact with respect to the independence of several Western National directors. In addition, two board members (otherwise totally unconnected to the acquiring company) "*might be burdened by potential conflicts of interest exclusively with respect to the merger transaction in question* [*because they had*] *entered into employment contracts* with [the acquiring company] around the time of the merger negotiations." (*Id.* at p. *20, italics added.) The court examined the facts of each challenged director's interests and found the conflicts to be minimal. The chancery court's ultimate finding of no breach of the fiduciary duties of loyalty or good faith rested on its determination that "fully informed," unaffiliated and disinterested Western National stockholders overwhelmingly approved the challenged merger, which was a product of arm's length negotiations between the acquiring

31

company and the merged company's special negotiating committee composed of three outside directors, assisted by its own financial and legal advisors. (*Id.* at pp. *2, 4.)[11]

Here, there was no "fully informed" shareholder vote to approve the sale; nor was the asset sale the product of arm's length negotiations with KatanaMe being represented by outside directors not burdened by conflicts. The court could and did determine from the evidence that Long and Huang's main interest was in continuing to be significantly involved in the development of KatanaMe's intellectual property and in continuing to have a financial stake in development of the product through stock options and positions in Skipper Wireless. These interests, in addition to their acceptance of employment with Skipper Labs, were sufficient in these circumstances to constitute a material self-interest, whatever defendants' personal financial circumstances. Additional evidence supporting the court's finding included the defendants' actions with regard to the ATA proposal, including defendants' refusal to continue negotiations with ATA (and their complete refusal to communicate with Graham, ATA's designated representative) following their refusal of its $3.5 million investment proposal, where the proposal required Long not only to step down as CEO and a director, but to receive no more than six months' salary and benefits.

We reject defendants' assertion that Long and Huang did not stand on both sides of the deal because they were not founders of IT-Farm or Skipper Wireless, never held director level positions there, and had no ownership interest in either. Defendants certainly assisted in creating Skipper Wireless, as Long's task list indicates. They may not have held director positions in Skipper Wireless, but at the time they approved the

---

[11] In *Orman v. Cullman* (Del.Ch. 2002) 794 A.2d 5, 28-29, also cited by defendants, the chancery court concluded that the allegation that a director had a financial interest in a merger because he would be a director in the surviving corporation, was insufficient to where that was the *only* allegation regarding the director's interest. (*Ibid.*) However, the chancery court ultimately concluded that the issue of whether a majority of the board of directors was either interested in merger or not independent, and thus whether entire fairness standard rather than business judgment standard applied to review of the merger, *could not on the facts before it be resolved as a matter of law* on a motion to dismiss. (*Id.* at p. 31)

asset sale they had accepted employment with Skipper Wireless that made Long senior vice president of operations and Huang senior vice president of engineering in Skipper Labs. Further, although they may not have been actual "owners" of Skipper Wireless at the time they approved the sale, they held pre-vested stock options in the company—a prospect of future ownership and a substantial financial incentive to support the asset sale.

Defendants' assertion that Long's belief he had a fiduciary duty to creditors cannot support a finding that he breached his duty of loyalty begs the question. First, there is no duty to creditors superseding the fiduciary duty of directors to the corporation and its shareholders. (*NACEPF* [*North American Catholic Educational Programming Foundation, Inc.*] *v. Gheewalla* (Del. 2007) 930 A.2d 92, 94 [recognizing traditional reluctance to expand directors' fiduciary duties to creditors].[12]) Second, assuming Long thought he had such a duty (and the court determined Long was *not* credible in many respects), it would not justify defendants' actions in putting the interests of corporate creditors before those of the shareholders of the corporation.

## IV. Breach of the Duty of Good Faith

Defendants argue the court applied the wrong standard in determining that they breached their duty of good faith in connection with the sale of KatanaMe assets. Our determination that the court did not err in concluding defendants breached their fiduciary duty of loyalty makes examination of the court's finding of breach of good faith unnecessary. As plaintiff demonstrated that defendants breached their duty of loyalty, the burden of proving the entire fairness of the transaction shifted to defendants, regardless whether the court properly concluded they also breached their duty of good faith.

___

[12] "It is well established that the directors owe their fiduciary obligations to the corporation and its shareholders. While shareholders rely on directors acting as fiduciaries to protect their interests, creditors are afforded protection through contractual agreements, fraud and fraudulent conveyance law, implied covenants of good faith and fair dealing, bankruptcy law, general commercial law and other sources of creditor rights. Delaware courts have traditionally been reluctant to expand existing fiduciary duties. Accordingly, 'the general rule is that directors do not owe creditors duties beyond the relevant contractual terms.' " (*NACEPF v. Gheewalla, supra,* 930 A.2d at p. 99.)

33

Nevertheless, we are persuaded the record supports the court's finding as to breach of good faith as well. The evidence we have relied upon above in support of the court's finding of breach of the duty of loyalty also supports the court's finding that defendants "breached their fiduciary duty of good faith, by intentional dereliction of duty and conscious disregard for their fiduciary obligations and directors and/or officers of KatanaMe Inc. . . . ." This was the appropriate measure for good faith in this case. (See *Stone, supra,* 911 A.2d at p. 369; *Disney, supra,* 906 A.2d at p. 67.)

Relying primarily on *Lyondell, supra,* 970 A.2d at page 244, defendants assert the inquiry the court should have made was whether directors "utterly failed to obtain the best sale price." Defendants take the sentence upon which they rely out of context and misquote it to boot. The *Lyondell* court observed: "Directors' decisions must be reasonable, not perfect. 'In the transactional context, [an] extreme set of facts [is] required to sustain a disloyalty claim premised on the notion *that disinterested directors* were intentionally disregarding their duties.' The trial court denied summary judgment because the Lyondell directors' 'unexplained inaction' prevented the court from determining that they had acted in good faith. But, if the directors failed to do all that they should have under the circumstances, they breached their duty of care. Only if they knowingly and completely failed to undertake their responsibilities would they breach their duty of loyalty. The trial court approached the record from the wrong perspective. Instead of questioning whether *disinterested, independent directors* did everything that they (arguably) should have done to obtain the best sale price, the inquiry should have been whether those directors utterly failed to attempt to obtain the best sale price." (*Id.* at pp. 243-244, italics added, fns. omitted.)

In marked contrast to the premise upon which the statement in *Lyondell* rested, the trial court in this case properly determined that defendants were *not* "disinterested" directors, but had put their own interests before that of the corporation and its shareholders. Consequently, the court was not required to determine that directors

34

"utterly failed to attempt to obtain the best sale price." (*Lyondell, supra,* 970 A.2d at p. 244.)[13]

## V. Destruction of Intellectual Property/Evidence

In a section of the statement of decision entitled "Lack of Documentation," the court questioned "[d]efendants' oral recitation of what occurred in negotiation of the sale and in regard to discussion of the fairness of the price and terms—given that written documentation such as executed agreement(s), emails, and other such communications were allegedly destroyed while under the custody and responsibility of [d]efendants." The court concluded that Long's testimony regarding the failure of various computers and servers during the first quarter of 2004 and after May 2004 when the engineers were laid off, made defendants' assertions of unintentional destruction of evidence and technology "not credible." The evidence "further call[ed] into question the assertion by [d]efendants that the intellectual property of KatanaMe was worth no more than $800,000 at the time [it was] sold, given that the intellectual property was basically destroyed while in the custody and responsibility of [d]efendants, such that it could not be given to an independent expert for valuation or appraisal after the filing of this lawsuit in September 2005. As directors and officers of a corporation there certainly could not be a fiduciary duty more fundamental than preservation of corporate assets."[14]

Defendants contend there was *no* destruction of evidence and they challenge portions of the court's description of defendants' testimony, specifically, its statement that Long testified "all data was lost after May 2004 . . . ." Defendants also assert the sale of KatanaMe's intellectual property to IT-Farms after the claimed computer server

[13] Were the test as urged by defendants, we believe that substantial evidence on the facts here presented would have supported a finding that defendants "utterly failed to attempt to obtain the best sale price."

[14] The court did not identify the fiduciary duty breached by defendants' failure to preserve these corporate assets. Most likely, such breach went to the question of duty of care. As the court recognized, breach of the duty of care could not provide a basis for the award of money damages. It does not appear that the court relied on the loss of corporate assets to bolster its findings of liability for defendants' breach of the duties of good faith and loyalty.

35

failures demonstrated there was no basis in the record for the court's statement that "the intellectual property was basically destroyed . . . ."

Defendants' challenges to these out-of-context snippets of the statement of decision miss the point. The court did not believe Long's somewhat confusing trial testimony or his conflicting declaration concerning details about the loss of documents and computer data. The statement of decision makes clear that the data with which the court was primarily concerned was written documentation and data that would have assisted an independent expert in valuing or appraising KatanaMe's intellectual property as of the sale date—such as documents providing details of the negotiations around the sale and itemizing or describing the KatanaMe intellectual property sold to Skipper Wireless.

Furthermore, substantial evidence supports the court's findings regarding Long's testimony and the destruction of evidence. Long did testify that the computer servers containing the engineering and technology information of KatanaMe were destroyed sometime in 2004. He testified that in 2003, his individual notebook hard drive was damaged and data was lost. He testified that the computer servers were water damaged and ceased to function in late 2004. (He acknowledged they may have been computers and not servers, as he had stated in his declaration. Long had also stated in a declaration that the engineering development code server was destroyed by overheating in the *first quarter* of 2004, and that the hard drive data was lost.) He testified at trial that, in *July* 2004, the hard drive on the software development server failed and the data was lost. Long testified the lost data on the code development server would have been the software code as well as the hardware blueprints for the hardware design. Long testified the data was still on the engineers' individual personal computers or laptops, but that after May 2004, when the engineers were laid off, " '[t]he hard disk drive on the software development server failed and could not be recovered or repaired. The data on the drive was totally lost.' " Long's personal laptop failed again and when he sent it to Apple for repairs the hard drive data was lost. Consequently, documents and emails regarding the asset sale and negotiations that were contained on Long's laptop were lost when its hard

36

drive failed. Huang testified he gave his functioning laptop to the engineers at Skipper Wireless and did not retain any copies or back up of data or documents.

Testimony from former KatanaMe engineer, Dinesh Nambisian, was credited by the court and undermined Long's testimony about the circumstances under which hard drive data was allegedly lost. Nambisian testified that he had set up the system of having two servers, with a copy of all data on each; that the data was backed up every night and thus, if there were a computer crash, only one day's data at most would be lost. He would also periodically back up all the data on CD-Roms and take them off-site as extra protection against data loss. He testified there was never a server failure while he worked at KatanaMe from October 2002 to May 2004.

Defendants assert there was no evidence to support a finding of "spoliation" as a matter of law or that any documents were destroyed by defendants with a culpable state of mind. These claims are for the most part red herrings. First, the court did not make a specific finding of "spoliation." It also refused to award plaintiff the sanctions he sought for such asserted spoliation. The court did not believe Long's explanation as to how data and documents became lost or destroyed. The evidence and inferences reasonably drawn from the evidence supported the court's findings that Long was not credible and specifically that Long's explanations regarding the destruction and loss of data and documents were not credible. Consequently, the evidence supported the court's drawing of inferences against defendants with respect to their claims that KatanaMe intellectual property was worth no more than $800,000 at the time it was sold to Skipper Wireless. (Evid. Code, § 413 ["In determining what inferences to draw from the evidence or facts in the case against a party, the trier of fact may consider, among other things, the party's failure to explain or to deny by his testimony such evidence or facts in the case against him, or his willful suppression of evidence relating thereto, if such be the case"].)

## VI. "Entire Fairness" Analysis

Defendants challenge the court's finding that they "failed to prove . . . the asset sale transaction, whereby nearly all assets of KatanaMe, including all of its intellectual

37

property and pending patents, were sold to Skipper Wireless Inc. for $800,000, was 'entirely fair' to the corporation and its shareholders."

Because the presumptions of the business judgment rule were rebutted by plaintiff's showing that defendants had breached their fiduciary duty of loyalty and, as well, by plaintiff's showing that defendants had breached their duty of good faith, the burden then shifted to defendants to demonstrate the "entire fairness" of the asset sale transaction to the shareholder plaintiff. (*Disney, supra,* 906 A.2d at p. 52; *Emerald Partners v. Berlin* (Del. 2001) 787 A.2d 85, 92; *Cinerama, supra,* 663 A.2d at p. 1162.

The Delaware Supreme Court "has described the dual aspects of entire fairness, as follows: [¶] 'The concept of fairness has two basic aspects: fair dealing and fair price. The former embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained. The latter aspect of fairness relates to the economic and financial considerations of the proposed [transaction], including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock. . . . However, the test for fairness is not a bifurcated one as between fair dealing and price. All aspects of the issue must be examined as a whole since the question is one of entire fairness.' [¶] [(*Weinberger v. UOP, Inc.* (Del. 1983) 457 A.2d 701, 711.)] Thus, the entire fairness standard requires the board of directors to establish 'to the *court's* satisfaction that the transaction was the product of both fair dealing *and* fair price.' [(*Cede, supra,* 634 A.2d at p. 361.)] In this case, because the contested action is the sale of a company, the 'fair price' aspect of an entire fairness analysis requires the board of directors to demonstrate 'that the price offered was the highest value reasonably available under the circumstances.' [(*Ibid.*)]" (*Cinerama, supra,* 663 A.2d at pp. 1162-1163.)

Although rebuttal of the procedural presumption of the business judgment rule does not establish substantive liability under the entire fairness standard, " '[b]ecause the effect of the proper invocation of the business judgment rule is so powerful and the standard of entire fairness so exacting, the determination of the appropriate standard of

38

judicial review frequently is determinative of the outcome of [the] litigation.' [Citations.]" (*Cinerama, supra,* 663 A.3d at p. 1163, and fn. 8.)  The analysis of entire fairness required the court to "consider carefully how the board of directors discharged all of its fiduciary duties with regard to each aspect of the non-bifurcated components of entire fairness:  fair dealing and fair price." (*Id.* at p. 1172.)  The court here did so.

## A.  *Fair Dealing Analysis*

An important factor in the fair dealing aspect of the entire fairness analysis is whether the transaction was an arm's-length negotiation.  "[A]rm's-length negotiation provides 'strong evidence that the transaction meets the test of fairness.'  [Citations.]" (*Cinerama, supra,* 663 A.2d at p. 1172; see *Weinberger v. UOP, Inc., supra,* 457 A.2d at p. 711 [no fair dealing where, among other things, negotiations, were "modest at best"].) Here, as we have discussed above, the court specifically found an absence of arm's-length negotiation.

"Another well-recognized aspect of fair dealing is the board of directors' duty of disclosure to the shareholders.  [(*Weinberger v. UOP, Inc., supra,* 457 A.2d at p. 711.)]" (*Cinerama, supra,* 663 A.3d at p. 1176.)  Our conclusion that the trial court's finding that defendants breached their fiduciary duty of disclosure to shareholders by their numerous misstatements and omissions of material facts regarding the sale transaction would be sufficient in and of itself to warrant a finding that defendants did not demonstrate the "entire fairness" of the transaction.  The court also found there was no fair dealing with respect to the shareholders, as the "purpose and effect of the asset sale was to 'freeze out' the minority shareholders, who received nothing and had no further interest in the KatanaMe assets.  Defendants and other insiders, on the other hand, had continuing monetary benefits by participating in the new entity, Skipper, and having financial interests in the new company and its intellectual property assets that used to belong to KatanaMe."

Other aspects of fair dealing that the court may consider include:  whether the board was motivated in good faith to achieve a transaction that was the best available transaction for the benefit of the shareholders (*Cinerama, supra,* 663 A.2d at p. 1174);

39

whether the board exercised due care in making a market check as part of its sales approval process (*id.* at p. 1176); whether the board focused carefully on whether the offer constituted the best price available in a sale of the company (*id.* at p. 1176); whether the board relied upon the advice of neutral advisors or outside legal counsel (*ibid.*); and whether board members were materially influenced in their negotiations by any self-interest (*ibid.*). The trial court's findings on these and other matters as described above, further support its conclusion that defendant board members did not engage in fair dealing with respect to the sale of KatanaMe assets to Skipper Wireless. Whether or not a "fair price" was received for the assets, the court's findings with respect to the lack of "fair dealing" provide an adequate basis, in the circumstances, for its finding that defendants failed to carry their burden of showing the "entire fairness" of the transaction.

**B.** *Fair Price Analysis*

Moreover, with respect to the "fair price" component of the entire fairness analysis, the court found that the price paid for the assets was not a "fair price." It had previously found that defendants had not attempted to sell all of the assets of KatanaMe or the entire company, before assisting in the creation of Skipper Wireless; but rather, had sought "investors" for KatanaMe. It further found that "the transaction was *not* inherently fair to the minority shareholders or to the corporation itself. Even if placed in bankruptcy, *rather than* an asset sale, the minority shareholders and/or KatanaMe might have received more money for its assets or may have found a buyer for the company or may have reduced or negated the debts against the corporation—because the transaction would be placed in the neutral hands of a trustee and bankruptcy court. Instead, the [transaction] was specifically designed to leave the minority shareholders with nothing, and designed to put the company in bankruptcy anyway after stripping away all of its assets for the price of the creditors' debt." Further, in its damages calculation, the court found that, at the time it was sold, the intellectual property and technology was worth *at least* the $3.5 million that ATA Ventures had offered in May 2004 (less than a year before the asset sale to Skipper) for control and majority ownership and that the board had rejected as too low. This finding was supported by substantial evidence and further

40

supports the court's determination that the price paid by Skipper Wireless for KatanaMe's assets was *not* a "fair price."

The cases cited by defendants in support of the entire fairness of the transaction are not helpful to them. *Cinerama, supra,* 663 A.2d 1156, found substantial evidence supporting the trial court's finding that the transaction was "entirely fair." (*Id.* at pp. 1178-1179 [applying the substantial evidence standard of review].) [15] That the *Cinerama* court relied upon a few factors that the court here did not address (lack of evidence that the timing of the transaction was such as to benefit defendants at shareholders' expense or that the buyer had the power to force the initiation of the deal) (*id.* at p. 1172), does not somehow undermine the findings of unfairness that the court here made upon ample evidence. Defendants' contentions that the negotiation was at arm's length, that there was no evidence they had any material conflict of interest, and no evidence that they put their interests ahead of shareholders are at odds with the court's findings and with the evidence, as we have described above.

Defendants contend the court "arbitrarily" rejected the testimony of their expert's opinion as to the fair price for the corporate assets. However, defendants cite no authority for that proposition and make little argument beyond that bald assertion. They claim that the court based its rejection on the ground that defendants' expert "focused on criticizing the analysis by Plaintiff's expert" and that the expert merely asserted that $800,000 was the best offer. Defendants ignore the court's explanation for why it placed no confidence in defendants' expert's analysis: that the expert "inexplicably mismatched financial information," taking categories and components of *balance sheets* and mixing them together with those *of profit and loss statements*. Defendants do not argue that this criticism was unjustified.

---

[15] "[T]his Court will not ignore the findings of the Court of Chancery if they are sufficiently supported by the record and are the product of an orderly and logical deductive process. [Citation.]" (*Cinerama, supra,* 663 A.2d at p. 1179.)

In sum, it was defendants' burden to show the sale transaction was "entirely fair" to the corporation and its shareholders. Substantial evidence on this record amply supports the court's finding that defendants failed to carry that burden of proof.

## VII. Damages

Defendants maintain that the damages award must be reversed, even if the court correctly found against them on liability. They first contend that to the extent the trial court's findings are premised on the conclusion that defendants breached their duty of disclosure, only injunctive relief before consummation of the transaction, and not monetary damages, was available to plaintiff. (*In re Transkaryotic Therapies, Inc.* (Del. Ch. 2008) 954 A.2d 346, 361-362.)[16] We have heretofore upheld the court's findings that defendants breached their duty of loyalty and their duty of good faith. Defendants' breach of the duty of disclosure contributed to the court's findings on the loyalty and good faith issues, but was by no means the sole basis for the court's findings of breach of those duties. Consequently, monetary damages were appropriate.

Defendants next contend that the only support for a damages award was the testimony of plaintiff's expert, which the court properly rejected as unduly "speculative." Defendants do not dispute that an award of monetary damages is within the court's equitable powers, but they contend that the damage award here was not supported by any cause and effect relationship between the breaches found and the damages awarded. We disagree.

---

[16] The trial court in *In re Transkaryotic Therapies, Inc., supra,* 954 A.2d 346, stated it could not grant monetary or injunctive relief for disclosure violations in connection with a proxy solicitation in favor of a merger three years after that merger had been consummated, "*where there* [*was*] *no evidence of a breach of the duty of loyalty or good faith by the directors who authorized the disclosures.*" (*Id.* at pp. 362-363, italics added.) In the alternative, the court observed that "not every breach of the duty of disclosure implicates bad faith or disloyalty" (*id.* at p. 363) and granted summary judgment on the ground that a breach of the duty of care *alone* did not support monetary damages on account of the exculpatory provision authorized by section 102, subdivision (b)(7). (*In re Transkaryotic Therapies, Inc.*, at pp. 360, 362-363.)

42

Once the court has concluded that the transaction was *not* entirely fair, "the measure of damages for any breach of fiduciary duty, under an entire fairness standard of review, is 'not necessarily limited to the difference between the price offered and the "true" value as determined under . . . appraisal proceedings. Under *Weinberger* [*v. UOP, Inc., supra,* 457 A.2d 701], the [trial court] "may fashion any form of equitable and monetary relief as *may* be appropriate . . . ." ' [(*Cede, supra,* 634 A.2d at p. 371.)]" (*Cinerama, supra,* 663 A.2d at p. 1166.) That is precisely what the court did in this instance.

The court used the ATA term sheet value of $3.5 million dollars as a minimum value, given that the KatanaMe board (consisting at the time of Long, Sayers and Fujimara) had rejected that term sheet as *too low* less than one year before. (Huang, who was present, considered the offer an "idiotic valuation.") The court deducted from that sum, the $800,000 paid by Skipper Wireless and an additional $500,000 attributed to the "functional 'extinguishment' of the alleged unpaid deferred salaries," yielding a net monetary injury of $2.2 million payable to KatanaMe on its derivative claims.

The court explained its reliance on the ATA term sheet. The court referred to evidence that the radio technology KatanaMe used or was to use for its products had the same specifications as a product Sprint was selling and that the technology could have been finally developed by KatanaMe if they had obtained sufficient funding. The ATA proposal was made less than a year before the sale to Skipper Wireless. It was "a proposal actually made by another company and specifically voted upon by the KatanaMe [b]oard . . . and thus has *some* earmarks of an arm's length proposal. Obviously at the time the [d]efendants considered KatanaMe's assets to be worth more than $3.5 million." Defendants reiterate their claims made at trial that the ATA term sheet was not a solid offer, as it could be further reduced by ATA at any time. However, that proposal already represented a significant reduction from the initial $12 million term sheet, it came after Graham's due diligence investigation and meeting with the engineers, and the offer was no longer reliant on contributions by other investors. The court properly could infer the proposed offer was reasonably solid at that point.

43

We conclude the court reasonably relied on the $3.5 million proposal made by ATA less than one year before and rejected by the board as too low a valuation in determining the minimum value for the corporation.

Defendants again assert, with no accompanying citations or argument, that the court arbitrarily rejected their expert's valuation opinion. We have previously found this claim to be meritless. Furthermore, cases cited by defendants for the proposition that the court did not have a basis to make a responsible estimate of damages, recognize the "significant discretion" given to the court in fashioning remedies in cases of this type. (*Bomarko, Inc. v. International Telecharge, Inc.* (Del. Ch. 1999) 794 A.2d 1161, 1184-1186 (*Bomarko*), affd. (Del. 2000) 766 A2d 437; *Cline v. Grelock* (Del. Ch., Mar. 2, 2010) 2010 WL 761142, *2 (*Cline*).)

In its general observations about damage calculations in fiduciary duty cases such as this, the chancellor in *Bomarko, supra,* 794 A.2d 1161, 1184 observed: "First, significant discretion is given to the Court in fashioning an appropriate remedy. In determining damages, the Court's 'powers are complete to fashion any form of equitable and monetary relief as may be appropriate . . . .' [(*Weinberger*, *supra,* 457 A.2d at p. 714.)] [¶] Second, unlike the more exact process followed in an appraisal action, the 'law does not require certainty in the award of damages where a wrong has been proven and injury established. *Responsible estimates that lack mathematical certainty are permissible so long as the Court has a basis to make a responsible estimate of damages*.' [Citations.] [Italics added.] [¶] Third, where, as is true here, issues of loyalty are involved, potentially harsher rules come into play. 'Delaware law dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly. . . . . The strict imposition of penalties under Delaware law are designed to discourage disloyalty.' [Citation.]" (*Bomarko,* at p. 1184.)

Similarly, the chancellor in *Cline, supra,* 2010 WL 761142, *2, also noted: " 'To be entitled to compensatory damages, plaintiffs must show that the injuries suffered are not speculative or uncertain, and that the Court may make a reasonable estimate as to the amount of damages.' [Citation.]" The *Cline* court concluded that although the self-

interested defendant had breached his fiduciary duty, which "ordinarily" "would have had consequences that should be remedied by damages" (*ibid.*), the plaintiff had not provided *any* basis for a rational award of damages. The plaintiff "offered no fair value of [the corporation] or any reasonable basis for calculating a value of [the corporation] at the time of dissolution." (*Ibid.*) In *Cline,* it was the chancellor—the trier of fact—who made the determination that it had not been provided "*any* basis for a rational award of damages." (*Ibid.,* italics added.) Here, in contrast, the trial court found the ATA offer provided a basis for a rational damages award. Such finding was adequately supported by the record.

Our finding that evidence in the record provides a reasonable basis for the court's damage award does not rely upon the court's findings with regard to the destruction and loss of evidence that likely would have enabled the court to more easily calculate damages. Such evidence might have provided a firmer basis for an increased damages award. However, the evidence before the court regarding the ATA proposal provided an adequate and not unduly speculative "floor" for the court's damages calculation.

## PLAINTIFF SYLLA'S CROSS-APPEAL

### I. Refusal to Award Prejudgment Interest

Plaintiff contends the court abused its discretion in refusing to award KatanaMe shareholders prejudgment interest pursuant California Civil Code section 3287, subdivision (a): "Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day . . . ."[17]

Plaintiff acknowledges that damages that must be determined by the trier of fact based on conflicting evidence are not normally ascertainable. However, he argues that in this case, the trial court's equitable calculation of KatanaMe's value at the time of the sale to Skipper Wireless evidences a "sum certain" under that Civil Code section.

Plaintiff also contends that prejudgment interest *can* be awarded where equitable

---

[17] The court also refused to award prejudgment interest under Civil Code section 3288, a determination that plaintiff does not challenge.

45

principles so demand (*Chesapeake Industries, Inc. v. Togova Enterprises, Inc.* (1983) 149 Cal.App.3d 901, 909 (*Chesapeake Industries*), and that defendants' spoliation of evidence provides a basis for the award of prejudgment interest under such equitable principles.

" '[O]ne purpose of section 3287[, subdivision (a)], and of prejudgment interest in general, is to provide just compensation to the injured party for loss of use of the award during the prejudgment period—in other words, to make the plaintiff whole as of the date of the injury.' [Citation.] Under section 3287[, subdivision] (a), 'the court has no discretion, but must award prejudgment interest upon request, from the first day there exists both a breach and a liquidated claim.' (*North Oakland Medical Clinic v. Rogers* (1998) 65 Cal.App.4th 824, 828.) Courts generally apply a liberal construction in determining whether a claim is certain, or liquidated. (*Chesapeake Industries*[*, supra,*] 149 Cal.App.3d [at p.] 907 . . . .) The test for determining certainty under section 3287[, subdivision] (a) is whether the defendant knew the amount of damages owed to the claimant or could have computed that amount from reasonably available information. (*Chesapeake Industries*, at p. 907.) Uncertainty as to *liability* is irrelevant. 'A dispute concerning liability does not preclude prejudgment interest in a civil action.' [Citation.] The certainty required by section 3287[, subdivision] (a) is not lost when the existence of liability turns on disputed facts but only when the amount of damages turns on disputed facts. [Citation.] Moreover, only the claimant's damages themselves must be certain. Damages are not made uncertain by the existence of unliquidated counterclaims or offsets interposed by defendant. (*Chesapeake Industries, supra,* at p. 907.)" (*Howard v. American National Fire Ins. Co.* (2010) 187 Cal.App.4th 498, 535-536.)

We reject plaintiff's argument that the damages awarded by the trial court amounted to a "sum certain." Although we have concluded the court did not err in basing its award of damages on the ATA proposal, the actual amount owing to the corporation was neither certain nor a liquidated claim until trial. The court could well determine that at the time they breached their fiduciary duties, defendants did not know the amount of damages owed to KatanaMe in this derivative action. Nor could defendants have

46

computed the amount from reasonably available information. That the court's award was not unduly speculative, but was reasonably based on the evidence presented, does not compel the conclusion that the damages were "certain" under the statute.

Plaintiff relies upon insurance cases in which "alternative theories required only the court's legal determination of which [legal theory] was appropriate [and] the amount of damages would thereby be fixed." (*Shell Oil Co. v. National Union Fire Ins. Co.* (1996) 44 Cal.App.4th 1633, 1651; *Fireman's Fund Ins. Co. v. Allstate Ins. Co.* (1991) 234 Cal.App.3d 1154, 1173-1174 [insurance policy governed amount of the award even though insurer suggested a specific amount due under each of four theories, the amounts were certain, the only question was liability].) Unlike those cases, which affirmed the trial courts' award of prejudgment interest, the trial court here properly determined that, at the time of their breach, there was no amount of damages that defendants knew or could have calculated from reasonably available information.

Nor do we agree with plaintiff that the court erred in failing to find that equitable principles required the award of prejudgment interest. Plaintiff relies upon the statement by the court in *Chesapeake Industries, supra,* 149 Cal.App.3d at page 909, that "[a]lthough an accounting action is prima facie evidence a claim is uncertain, we do not foreclose the possibility of prejudgment interest in an accounting action where equity demands such an award." The *Chesapeake Industries* court affirmed the trial court's *denial* of prejudgment interest.

Plaintiff argues that equity demands the award of prejudgment interest in this case where the evidence demonstrated defendants' destroyed "critical valuation evidence." Were we to conclude the court in these circumstances *might* have determined that equitable principles required the award of prejudgment interest, we cannot conclude the court was *required* to do so. Plaintiff has cited no case requiring a trial court to award prejudgment interest on unliquidated damages solely on the ground that "equity" demanded it. In any event, such an equitable determination will generally lie within the sound discretion of the trial court. (See., e.g., *Estates of Collins & Flowers* (2012)

47

205 Cal.App.4th 1238, 1246 ["A trial court sitting in equity has broad discretion to fashion relief"].)

The trial court did not make an express finding of spoliation of evidence; nor did it grant sanctions sought by plaintiff based on the destruction or loss of evidence. In these circumstances, where the damages were not liquidated or certain *and* where the only possible basis for prejudgment interest was an equitable one, we cannot conclude the court erred in refusing to award prejudgment interest.

## DISPOSITION

The judgment is affirmed. Plaintiff shall recover his costs on this appeal.


_____
Kline, P.J.


We concur:


_____
Haerle, J.


_____
Richman, J.

48